## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**UZEZI AJOMALE individually and on behalf of similarly situated individuals,**

      **Plaintiff,**

**v.**

**QUICKEN LOANS, INC.,**

      **Defendant.**

**Case No.  1:17-cv-539-JB-MU**

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S  MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Uzezi Ajomale and as her response in opposition to the Motion for Summary Judgment and its supporting documents [Docs 77, 78 and 79] ("Motion") by Quicken Loans, Inc. ("Quicken"), provides the following Narrative Statement of Relevant Facts and Legal Argument:

### INTRODUCTION AND SUMMARY

The Fair Credit Reporting Act ("FCRA") requires mortgage lenders to provide a Credit Score Disclosure ("CSD") to consumers when their credit scores are used in connection with a mortgage loan.  The CSD is required each time a lender "uses a consumer credit score. . . in connection with an application initiated or sought by a consumer for [mortgage loan]."  15 USC § 1681g(g).  This provision was enacted as a part of the Fair and Accurate Credit Transactions Act of 2003 ("FACTA").  FACTA introduced major amendments to the FCRA, aimed at expanding notice to consumers when their personal credit information is used and requiring disclosure to the consumer regarding the nature of the credit information used and the entities accessing the information.

In February 2017, Plaintiff's (then) husband initiated a joint mortgage loan inquiry through Quicken's website for both himself and Plaintiff.  He did so without her knowledge or permission. Within seconds, Quicken pulled credit reports and credit scores for both Ajomales.  A few minutes later, Quicken's loan officer determined that Plaintiff's credit score was too low for her to be included on the loan.  Later that day, the loan was processed to the application stage with Mr. Ajomale as the sole applicant.  He was sent a CSD that same day. However, under Quickens disclosure policy, Plaintiff was not provided a CSD because she was not "an applicant," even though her score was used in connection with the joint loan inquiry and the application submitted by Mr. Ajomale.

When a consumer submits a joint mortgage inquiry for both spouses, it is Quicken's policy to only send a CSD to the spouse who actually submits a formal loan application, even when it uses both sets of credit scores in connection with that application.  The development of Quicken's "applicant only" policy is well documented and reveals that, in the face of open hostility toward the CSD requirement from Quicken's chairman and owner, Quicken's Compliance Team purposefully limited CSDs to "applicants," even though it routinely used credit scores of consumers who did not submit an application.  At the same time, the team acknowledged that the broad statutory terms "in connection with" and "sought by" included consumers whose scores were used, regardless of whether an actual application was submitted.  However, Quicken's team worried that if CSDs whenever a score was used, calls would "skyrocket" from spouses, just like Plaintiff, who were unaware that their credit information was being used. Quicken adopted its "applicant only" policy to avoid such calls.

After this policy was adopted, the Federal Trade Commission ("FTC") issued staff opinion confirming that CSDs are required each time a credit score is used in connection with a mortgage

2

loan, even in the pre-qualification stage and without regard to whether competed application is submitted. Also, in 2013 the same conclusion was reached by the only court to address this issue. Quicken stuck to its policy, even in the face of these warning signs.

Quicken takes the same position here. It claims Plaintiff is not owed a CSD because she was never an "applicant" and did not "initiate" or "seek" an application. It also argues it did not "use" Plaintiff's score because she was not an "applicant." These arguments have no merit. Congress could have, but did not, limit the CSD requirement to submitted applications. Instead, the terms "in connection with," "initiated by" and "sought by" expressly to extend the requirement beyond submitted applications. This is confirmed by the regulatory and judicial interpretations of 1681g(g). On the other hand, there is no support for Quicken's "applicant only" interpretation and none is cited in its brief.

The statutory language also forecloses the argument that the consumer entitled to the notice must be the same consumer who "initiated or sought" the application. A CSD is required when "*a* consumer score" is used in connection with "an application initiated or sought by *a* consumer." Congress could have substituted the second "a" with "the," thereby tying the requirement to the same consumer who initiated or sought the application. Instead, the use of both "a"s expands the disclosure to all consumers whose scores were used in connection with a mortgage loan, including those who did not initiate or seek an application. This is consistent with FACTA's goal of expanding consumer awareness of the use of their credit information, even when the consumer does not initiate or even know about the transaction (as in the case of identity theft). Moreover, under Quicken's policy, it does not matter which spouse initiated the contact with Quicken. Either way, the disqualified spouse would not get a CSD because that spouse would not be an applicant.

Moreover, when it accessed and used Plaintiff's score, it treated both her and her husband as potential borrowers "seeking" a mortgage application.

Quicken made a calculated decision to stick to its "applicant only," even in the face of the clear and broad language of 1681g(g) and the regulatory and judicial interpretations. And Quicken acknowledged that by doing so it risked violating the statute. It nevertheless calculated that the risk was justified by the benefit of avoiding a "skyrocket" of calls from spouses otherwise unaware that their credit information was being used. This provides more than ample evidence supporting Plaintiff's claim that Quicken willfully violated 1681g(g).

## NARRATIVE STATEMENT OF RELEVANT FACTS

### A.   Mr. Ajomale Initiates a Joint Mortgage Inquiry for Himself and his Wife

On February 20, 2017, Ajibola Ajomale logged onto Quickenloans.com to inquire about a home mortgage refinance loan. At that time, he and Plaintiff were married and shared a home at 8800 Floyd Crabtree Way, Semmes, Alabama, 36575-6334.[1] He did not tell his wife about his contact with Quicken.[2]

After logging on, Mr. Ajomale completed Quicken's online "Lead Form," which Quicken uses to gather the information needed to pull a potential borrower's credit report.[3] The top of Quicken's form reads: "Congrats! You're one step closer to a new mortgage! Now, please provide information so that we can verify your credit. It's secure, fast, easy and will expedite your

---

[1] They were divorced in February 2018. Mrs. Ajomale and her children currently live in the home.

[2] Deposition of Uzezi Ajomale ("Ajomale Depo."), excerpts of which are attached hereto as Exhibit 1, pp. 22, 27-30.

[3] Deposition of William Emerson, the witness designated to provide testimony under 30(b)(6), ("Emerson Depo."), excerpts of which are attached hereto as Exhibit 2, p.16.

mortgage process." Just below that are two questions: "Are you the only person applying for this loan?" and that: "Is the other person on the loan your live-in spouse?"[4] Mr. Ajomale checked "no" to the first question and "yes" that he and his wife were "applying for the loan."[5] That prompted questions requesting information for both of them.[6]

After providing both sets of personal information (including dates of birth and social security numbers), Mr. Ajomale checked the "Authorization" box near the bottom of the form which says: "By checking this box, you authorize Quicken Loans to access your credit report and the report of your spouse for the purpose of a mortgage inquiry."[7] Quicken allows one spouse to complete the Lead Form and authorize access to both spouse's credit information without participation by the other spouse.[8]

Through Quicken's automated system, a credit report and credit scores for both Mr. & Mrs. Ajomale were sent to Quicken within seconds after Mr. Ajomale submitted the authorization. This credit information was generated by CoreLogic Credco ("Credco") (a third-party vendor) which pulled the information from the credit bureaus and transmitted it into Quicken's system.[9] Because Mr. Ajomale completed the Lead Form for both spouses, a joint credit report was generated, listing

---

[4] The Lead Form produced by Quicken is attached hereto as Exhibit 3. It is a blank form. Quicken has not produced a copy of the form actually completed by Mr. Ajomale. However, it is undisputed that he provided the personal information for himself and his wife which Quicken used to access the credit reports and credit scores for both of them.

[5] Id.

[6] Emerson Depo. (Ex.2), pp. 30-32.

[7] Exhibit 3;

[8] Emerson Depo. (Ex. 2), pp. 20-21.

[9] Id., pp. 17-20, 26, 32-33 & 38.

credit scores and credit information for both Ajamoles.[10]  The report lists both Ajomales under the heading "Applicant Information," identifying Mr. Ajomale as "Client #1" and Mrs. Ajomale as "Client #2."  The credit report also identifies Mr. Ajomale as "Borrower" and Mrs. Ajomale as the "Co-Borrower." Just below the "Applicant Information" appear credit scores from all three credit bureaus for each of the Ajomales. The highest score listed for Mrs. Ajomale was 530.[11]

Credit reports and scores can only be accessed for one of the permissible purposes listed in the FCRA. 15 U.S.C. § 1681b(a).  One of the permissible purposes allows access in connection with a request for an extension of credit.  Quicken accessed credit information for both Ajomales under this purpose, and it did so in reliance on Mr. Ajomales' joint authorization.[12]  In its agreement with Credco, Quicken certified that it will order credit information solely "[i]n connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to. . .. the consumer."[13]

Mrs. Ajomale was not aware that her husband contacted Quicken; that he provided her personal information; or that he submitted a loan inquiry in her name.  She was completely in the dark as to her husband's dealings with Quicken until three weeks later, when he finally told her that he had applied for a refinance loan with Quicken.[14]

## B.    Quicken Disqualifies Plaintiff Because of Her Score

---

[10] Merged Credit Report, attached hereto as Exhibit 4.

[11] Id., p. 1 & 15.

[12] Emerson Depo. (Ex. 2) pp. 129-131; See also Quicken's "Fair Credit Reporting Action Policy Statement," attached hereto as Exhibit 5, p. 4. Under certain circumstances, the FCRA allows one spouse to authorize a credit pull for both.  FTC Staff Summary § 604(a)(3)(A) – 2.A.

[13] See Credco/Quicken "Agreement for Service," attached hereto as Exhibit 11.

[14] Ajomale Depo. (Ex. 1) pp. 21-26, 104-105.

Immediately after the credit report was transmitted to Quicken, Jonathan Betcher ("Mr. Betcher"), the Quicken broker assigned to the Ajamole inquiry, began a chat dialogue with Mr. Ajamole about the refinance loan.  Several minutes into that discussion, Mr. Betcher began discussing the prospect of Mrs. Ajamole being included as a borrower on the loan.   After review of their credit scores,  Mr. Betcher determined that Mrs. Ajamole was not qualified due to her score:  "Okay, Uzezi credit [score] is under 620, it is in the low 500's[.] Only chance we have is to have mortgage in your name, and keep you both on title."[15]  By this, Mr. Betcher meant that the loan and promissory note must be underwritten in Mr. Ajamole's name only, but that both spouses will have to sign the mortgage.[16]

## C.   Loan Application is Processed in Mr. Ajamole's Name and He is Immediately Provided a CSD

Once Mr. Ajomale agreed to move forward, the loan was elevated out of Quicken's lead management system and into the loan processing system it calls "AMP."   AMP is the loan processing platform that manages the process from application through closing and post-closing. When Mr. Ajomale e-signed the requisite documents, the loan was transferred to AMP.[17]  Pursuant to Quicken's policy, CSDs are generated at this point but are only sent to "applicants."  This is the case even when credit scores are used for both spouses to evaluate their eligibility.  Because Quicken had disqualified Plaintiff (based on her credit score), Mr. Ajomale was the sole "applicant" and the sole recipient of a CSD.  Under Quicken's policy, this would be the case any time a spouse listed on a joint Lead Form is eliminated as an "applicant" before the loan is

---

[15] See Chat Dialogue, attached hereto as Exhibit 6.

[16] Because this was to be a loan on the Ajamoles' homestead, both spouses must sign the mortgage. (Emerson Depo. (Ex. 2) pp. 43-47.

[17] Id., pp. 54-56, 79-80.

processed, even when that spouse's credit score was used.  Moreover, it does not matter which spouse completed the form or initiated the contact with Quicken.  Either way, the non-qualifying spouse would not get a CSD.  In other words, had Mrs. Ajomale contacted Quicken about the loan, the result would have been the same:  She would have not received a CSD because her score was too low to qualify her as an "applicant."[18]

Mr. Ajomale's CSD was mailed the same day he first contacted Quicken – February 20, 2017.[19]  The disclosure identifies Quicken as the lender and provides basic information about the credit score Quicken used.  It also provides information regarding Mr. Ajomale's right to dispute information in his credit report and how to obtain a free credit report.[20]  Mrs. Ajomale did not receive a CSD.  She, therefore, remained unaware that her husband had contacted Quicken and that Quicken had used her credit information to determine whether or not she qualified for a mortgage.[21]

**D.**    **Quicken Adopts a Narrow Disclosure Policy, Knowing that it Risked Violating the Statute, to Avoid Calls by Unaware Spouses**

Quicken's failure to send Plaintiff a CSD was not an accident or even an individual decision.  It was the result of Quicken's across-the-board policy that when there is a joint inquiry, only the spouses deemed to be "applicant"[22] are provided CSDs.  The development of this policy is well documented in emails between members of Quicken's Compliance Team.   Those discussions reveal four pertinent facts: (1) Quicken's leadership was openly hostile toward the

---

[18] Id., pp. 167-168.

[19] See February 20, 2017 Credit Score Disclosure, attached here to as Exhibit 7.

[20] Id.

[21] Ajomale Depo. (Ex. 1), pp21-26, 104-105.

[22] Emerson Depo. (Ex. 2) pp. 72-74, 80, 138-139, 141-143 and 148-150.

disclosure; (2) Quicken was fully aware from the beginning that Section 1681g(g)'s "sought by" language extended the CSD requirement beyond just those who submit applications and the Compliance Team worried that its "applicants only" policy risked violating the statute; (3) Quicken not only ignored the broad statutory language, but also guidance from the FTC and the judiciary clarifying that CSDs were required anytime a credit score was used in connection with a mortgage loan, regardless of whether the consumer submits an application; and (4) Quicken adopted and stuck to this policy specifically to avoid increased calls from spouses in exactly Plaintiff's situation – those who had no idea that their spouse had authorized Quicken to pull their credit.

Section 1681g(g) became effective December 1, 2004. In the preceding weeks, Quicken's Compliance Team exchanged emails discussing the requirement and specifically when and to whom the CSD should be provided. The discussions included whether to tie the CSD requirement to use of the credit score or to the submission of an application.[23]

The email exchange began on November 7, 2004 with an announcement of the new requirement by Sue Pelto ("Ms Pelto"), the head of the Compliance Team. Within minutes, Dan Gilbert, Quicken's owner, chairman and founder, responded with open hostility toward the new requirement:

> This will NOT be a new document in out app package. … The absurdity of each year that passes that NEW INSANE AND MEANLESS DISCLOSURES OUR *(sic)* added to the loan process has got to stop.[24]

After this email, the team immediately began discussing how to comply while limiting any additional burden on the existing process. The discussion turned to limiting the disclosure to

---

[23] See Policy Emails, attached hereto as Exhibit 8.

[24] See Dan Gilbert November 4, 2004 email, Exhibit 8, p. 1.

borrowers who submitted completed applications.[25]  Days later, Ms Pelto expressed her concern to team members that restricting the disclosure to applicants conflicted with the broad statutory language.   "To me, 'application sought' means the inquiry where we have pulled credit.  I will shoot John Gerison [outside counsel] a quick email to confirm."[26]  That same day she emailed outside counsel, expressing in more detail her concern that "an application initiated or sought by," includes consumers whose credit score are being used in connection with a mortgage loan regardless of whether they end up submitting a formal application or not.

> I have one more question on the credit score notice.  I want to be sure we are sending them notice when we should be and trying to get some clarification on what is meant by 'an application sought by'.

> Section 609(g) states:

> Any person who makes or arranges loans and who uses a consumer credit score, as defined in subsection (f) in connection with an <u>application initiated or sought by</u> a consumer for a closed end loan or the establishment of an open end loan shall provide to the consumer as soon as reasonably practicable…. the credit score notice.

> **I am interpreting this to mean a client could contact us and give us verbal permission to pull credit, even though we may not have officially taken an application, yet.  This would happen when we contact a person that has expressed an interest in a loan with us through our website but has not yet applied.**

> Can you confirm whether this interpretation is accurate?  This will be important for our sales force to know about and I want to be sure our policies and procedures are accurate as well.[27]

---

[25] Emerson Depo. (Ex. 2), pp. 152-153.

[26] Exhibit 8, p. 7.

[27] <u>Id</u>., p. 6. (underline in original; bold provided).

After speaking with outside counsel, Ms Pelto reported back that other lenders were grappling with the "application sought" language and that the Mortgage Bankers Association identified the same concern, but decided not to pose the question to the FTC for fear of "opening up a can of worms."[28]  She also reported that outside counsel advised her that any opinion that the CSD could be sent only to applicants "wouldn't be without risk."[29]  At the same time, Ms Pelto raised concern that sending CSDs to spouses whose scores were pulled without their knowledge and who would be learning about the pull for the first time through the CSD would drasticslly increase calls.  "If we trigger this notice from LOLA [Quicken's lead allocation system], then we run the risk of increased phone calls to Client Relations and Bankers with co-applicants stating they never authorized the credit pull, even thought *(sic)* we know we have 'implied' authority if given by the spouse.  With this option [sending the CSD only to applicants], the notice won't affect Sales and should not increase calls to Client Relations."[30]  To Ms Pelto, avoiding the risk of these increased calls outweighed the risk that an "applicant only" policy would violate the statute.  Thus, the "applicants only" policy was announced: "[S]ince there is no clear guidance on what is meant by an 'application initiated or sought', and in speaking with outside counsel on this, we have made a decision not to include a credit pull from a lead as the trigger, but an actual application package or denied lead."[31]  She repeated her concern that if CSDs were sent to all consumers whose scores were used, Quicken  would be flooded with calls from spouses who had no idea their credit information was accessed:

---

[28] Id., p. 9.

[29] Id.

[30] Id.

[31] Id., p. 10.

The law is so vague right now, and after talking to outside counsel that represents the MBA, we decided to take this approach for a couple of reasons.  We were concerned that if we sent them each time credit was pulled, *our calls to Client Relations would skyrocket because of the spouse that didn't know about the loan*.  We didn't want to start that practice and have to stick with it, we thought it would be better to go the route we went and change it later if required to.

The MBA has a list of questions for the FTC on this, but they told me they probably won't bring this one up because they didn't want to open a can of worms... I am with them![32]

In response to a question from a Quicken employee about potential borrowers who never provide a formal application, Ms Pelto responded: "The position we are taking at this time is that they *(sic)* are not obligated to provide them one.  We are going to wait for further clarification on what is considered an 'application initiated or sought'.  I've talked with outside counsel that represents the MBA (just happens to be the same guy that represented us in our FTC litigation) and he said they may not even take this question to the FTC in *(sic)* to leave well enough alone.  *If applications sought were to include anyone we pulled credit on, can you imagine how many client calls we would get saying they didn't know anything about the credit pull?"*[33]

The "applicants only" policy implemented in 2004 is, in essential part, the policy in place today:  The CSD is sent when the loan moves to the formal application process and is only sent to the "applicants on the loan."[34]   Quicken stuck to this policy despite several warning signs that its approach was too narrow.  In an exchange of emails in 2010, Credco informed Quicken's team that it interprets the CSD requirement to trigger from the pulling of credit.[35]  Quicken nevertheless continued to tie the CSD requirement to the submission of a formal application.  This remained

---

[32] Id., p. 8. (emphasis added).

[33] Id., p. 12. (emphasis added).

[34] Emerson Depo (Ex. 2), pp. 111, 115-116. See also Exhibit 5.

[35] See 2010 Emails, attached hereto as Exhibit 9.

the case even after the FTC staff issued guidance explaining that "initiate or sought by" is broader than simply anytime an application is submitted, specifically finding that the requirement extends to "pre-qualification" process:

DISCLOSURE OF SCORES.

> Pre-application Consultation. This section requires a score disclosure by any person who 'uses (a score) in connection with an application *initiated or sought* by the consumer' for a real estate secured loan. When a consumer consults a broker or lender about the options available, and that broker or lender procures and uses a score as part of that process, **a disclosure is required even if the consultation does not include a formal or informal application.**[36]

In 2013, a federal district court addressing exactly this issue also clarified that a CSD is required when a credit score is used in a prequalification setting, even when the consumer never submitted an actual application.[37]

Thus, by mid-2013 Quicken had received the clarification it said was missing back in 2004: Guidance from the FTC and the judiciary as to whether a CSD is required when no application is submitted. This was no doubt not the guidance Quicken wanted, but it had no reasonable basis for expecting anything else. As Ms Pelto suspected from the beginning, the broad and plain language of the statute reached beyond just submitted applications. The subsequent guidance from the FTC and the judiciary, as well as the absence of any authority supporting Quicken's narrow interpretation, simply confirms the plain meaning of Section 1681g(g). In any event, this guidance

---

[36] FTC Staff Summary, Section 609g(3)(A)(Italics in original; bold added). Upon transfer of administrative authority over the FCRA from the FTC to the Consumer Finance Protection Bureau in 2011, the FTC guidance was reprinted in the FTC Staff Report "40 Years of Experience with the Fair Reporting Act," available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720 fcrareport. pdf. Section 609g(3)(A) appears on page 74 of the report.

[37] Daly v. Nw. Sav. Bank, 2013 WL 12291519 (W.D. Pa. Mar. 20, 2013). The Daly decision is discussed in detail below in Section C of the Legal Argument.

removed any possible doubt that Quicken's "applicant only" policy is too narrow and omits consumers, such as Plaintiff, who are entitled to the notice because their scores were used in connection with a mortgage loan. Still, Quicken never wavered from its "applicants only" policy out of fear that otherwise calls from spouses who (like Plaintiff) had no idea their credit was being used, would "skyrocket."[38]

**E.      Plaintiff Discovers the Quicken Loan**

As stated, Plaintiff was completely unaware of her husband's discussions with Quicken until he told her on March 13th. Even then, she had no idea that her credit was used or that she had been disqualified. She did not learn that Quicken had pulled her credit score until days later when she paid for a credit report and discovered an inquiry from Credco.[39] She researched Credco and discovered that the pull was made for Quicken when her husband first began his discussions with Mr. Betcher.[40]

Mrs. Ajomale was upset that this was done without her knowledge and involvement.[41] But she did not reject the idea of refinancing out of hand. Instead, she contacted Mr. Betcher with questions. In an email dated March 13, 2017, she introduced herself and asked for a copy of the loan papers ahead of any closing.[42] The next day she asked questions about the effect of the loan on her title and her access to equity.[43] On March 17th, she asked "[h]ow was it determined that my

---

[38] Id., p. 8.

[39] Ajomale Depo. (Ex. 1), pp. 21-26, 104-105.

[40] Id., pp.25-26, 32-37, 120-121.

[41] Ajomale Depo. (Ex. 1), pp. 26-27.

[42] See Ajomale Emails, attached hereto as Exhibit 10, p. 1.

[43] Id., p. 5.

name could not be included in the refinancing process?"  Mr. Betcher's only response to that question was that he discussed it with her husband.[44]  No mention was made of Quicken's access or use of her credit score, or Mr. Betcher's determination that her score was too low.  In fact, Mr. Betcher goes on to say that she could be added to the loan "as long as credit is real good, and no issues."[45] Of course, he knew her credit score was too low.  But he never mentioned to her the real reason why she was not included.

On March 18th, Plaintiff purchased her credit report and discovered that Quicken had accessed her credit back on February 20th.[46]  The next day she informed Mr. Betcher that she "will not be participating in the process, as [she] was not informed, included, neither did [she] give consent in the [beginning] stages of any of this."[47]  In mid-April, Mrs. Ajomale reached out to Quicken and asked if the process could remain open a bit longer.  She did this to see what her loan options were.[48] Quicken did not respond.

Had Quicken sent her a CSD when it sent Mr. Ajomale's (February 20th), she would have learned all this just days after the inquiry started.  A CSD would have notified her that her score was obtained and used by Quicken, would have disclosed the score and would have identified the factors adversely affecting her score.  The CSD would also have explained how to dispute errors in a credit report and how to obtain a free annual credit report.[49]  All this was unknown to Plaintiff

---

[44] Id., pp. 6-7.

[45] Id.

[46] Ajomale Depo. (Ex. 1), pp. 36-37.

[47] Exhibit 10, p. 11.

[48] Id., p. 16; Ajomale Depo. (Ex. 1), pp. 49-52.

[49] Exhibit 7.

at the time.  Had she known that she could have accessed her report for free, she would not have paid to pull her credit report.[50]  A CSD would also have addressed her principal objection to the process - that she was not included from the beginning and was not informed that her credit was being used.[51]  Had she been notified of the process, the outcome could have been different and she might have agreed to the loan – "I could have made an informed decision."[52]

## LEGAL ARGUMENT

### A.     The Section 1681g(g) Credit Score Disclosure Requirement

Section 1681g(g) was enacted as part of the FACTA, which introduced major amendments to the FCRA.  FACTA broadly expanded consumers' access to the credit information compiled by credit bureaus and used by potential creditors.  FACTA provided consumers the right to free access to credit reports; required disclosure of credit scores and information used when making adverse credit decisions and setting risk-based pricing; and required credit bureaus to provide extensive information on how credit information is used; as well as the consumers' rights to correct errors,[53] to name just a few of the changes.  A major focus of FACTA was credit scores, which under the previous version of FCRA were not required to be disclosed to consumers.  Congress recognized the increasingly use of scores to determine eligibility for credit and the terms of credit, as well as insurance and employment; and it set out to expand consumer access to the scores being used to make these decisions.[54]  Accordingly, FACTA required credit bureaus to provide credit scores to

---

[50] Ajomale Depo. (Ex. 1), pp.145-146.

[51] Id., pp. 22-23.

[52] Id., pp. 146-47.

[53] 15 U.S.C. §§ 1681j(a)(1)(C), 1681m(h) & 1681g(a).

[54] Senate Report No. 109, 108th Cong., 1st Sess., 6-7 (2003).

consumers[55] and, through Section 1681g(g), required mortgage lenders to provide credit score disclosures to consumers whose scores are used in connection with a mortgage loan.  Section 1681g(g) states as follows:

> Any person who makes or arranges loans and who uses a consumer credit score, as defined in subsection, in connection with an application initiated or sought by a consumer for a closed end loan … shall provide [Credit Score Disclosure] to the consumer as soon as reasonably practicable.

15 USC § 1681g(g).  Thus, a consumer is entitled to a CSD if the following elements are met: (1) A person who arranges or makes loans (2) uses a consumer's credit score (3) in connection with an application initiated or sought by a consumer for (4) a residential mortgage loan.  There is no dispute in this case that elements (1) and (4) are satisfied.  Quicken is a residential mortgage lender and the loan discussed with the Ajomales was a residential mortgage loan.[56]

Quicken argues that it did not "use" Mrs. Ajomale's score "in connection with an application" "initiated or sought by a consumer" because she was never an "applicant."  It also argues that Plaintiff was not owed a CSD because she did not "seek" or "initiate" a loan application.  These arguments are defeated by the plain text of 1681g(g), the interpreting law, as well as the evidence.

**B.    Quicken "Used" Plaintiff's Credit Score**

The term "use" is not defined in FCRA.  Words not defined are to be given their ordinary meaning.  Perrin v. United States, 444 U.S. 37, 42 (1979).  The Supreme Court defines "use" as "to employ or derive service from."  Smith v. United States, 508 U.S. 223, 229 (1993).[57]  In the

---

[55] 16 U.S.C. § 1681g(a).

[56] Emerson Depo. (Ex. 2), p. 28.

[57] Similarly, Black's Law Dictionary defines "use" as "[t]he application or employment of something." *Black's Law Dictionary* (11th ed. 2019).

only case to address the meaning of "use" in the context of 1681g(g), the Fourth Circuit held that although "use" means more than simply gathering the credit score, it is satisfied when a lender "employs" or "derives some service from" the score.   Kingery v. Quicken Loans, Inc., 629 F. App'x 509, 515 (4th Cir. 2015).   Thus, a credit score is "used," in the context of 1681g(g), when the score is "considered" or "consulted" or "taken into account" when determining eligibility for a loan.   Id., 629 F. App'x at 515.

There can be no serious question that Quicken "used" Plaintiff's credit score.   As acknowledged by Quicken's witness, Mr. Betcher's chat comments ("Uzezi credit is under 620...[o]nly chance we have is to have mortgage in your name...") indicate that he determined, based on her credit score, that Plaintiff was unqualified to be included on the loan with her husband.[58]   Obviously, this goes beyond merely gathering the credit score. Quicken clearly "consulted," "considered" and "took into account" the score when Mr. Betcher deemed Plaintiff ineligible.   Kingery, 629 F.App'x at 515.   Moreover, credit scores are relevant factors for all the loan programs offered by Quicken.[59] Therefore, whether it denied or approved a potential borrower, credit scores are always relevant, if not determinative, and Quicken necessarily "consults," "considers" and/or "takes them into account" on a regular basis when determining loan eligibility.[60]

Quicken does not challenge the facts with regard to "use."   Instead, it argues it did not

---

[58] Emerson Depo. (Ex. 2), p. 47.

[59] Emerson Depo. (Ex. 2), pp. 177-78.

[60] The plain text of section 1681g(g) ties the CSD requirement to "use" of the score, without regard to whether adverse action was taken, or whether the score was the determinative factor for the lender's decision.

"use" her score within the meaning of the statute because she was never an "applicant."[61] This is a circular reiteration of its underlying premise: It is only required to provide a CSD to consumers who actually submit a completed application.

**C.      Quicken's Use of Plaintiff's Score was "In Connection With" an Application "Initiated or Sought by A Consumer"**

Section 1681g(g) is expressly *not* restricted to consumers who submit completed applications.  It requires a CSD whenever a score is "used in connection with" an application "initiated" or "sought by" a consumer.  The phrase "in connection with" expands rather than restricts.  United States v. Hernandez, 194 F. App'x 851, 854 (11th Cir. 2006)("[W]e have held that the phrase ['in connection with'] should be interpreted expansively, not restrictively…"); United States v. Thompson, 32 F.3d 1, 7 (1st Cir.1994) "[T]he phrase 'in connection with' should be interpreted broadly...."); United States v. Wyatt, 102 F.3d 241, 247 (7th Cir.1996)("[T]he meaning of the phrase 'in connection with' should be construed expansively.").  Also, applications can be "initiated" or "sought," yet not completed or submitted, and the use of the broader language demonstrates Congress' intent to expand the scope or the requirement beyond merely submitted applications. Daly v. Nw. Sav. Bank, 2013 WL 12291519 (W.D. Pa. Mar. 20, 2013).  Accordingly, the FTC highlighted the "*initiated or sought"* language when it reached its conclusion that the CSD requirement applies to any "pre-application consultation": "When a consumer consults a broker or lender about the options available, and that broker or lender procures and uses a score as part of that process, **a disclosure is required even if the consultation does not include a formal or informal application.**"[62] The Eleventh Circuit has repeatedly deemed FTC staff commentary

---

[61] Doc. 78, pp. 12-13.

[62] FTC Staff Summary, Section 609g(3)(A).  The full text of the guidance appears above in Section D of the Narrative Statement of Relevant Facts.   The FTC placed the terms "initiated or sought" in italics.

instructive and afforded it considerable weight where, as with the FCRA, it was the primary agency enforcing and administering the statute.[63]  While the FTC Staff Commentary to the FCRA is not binding, the FTC was for forty years the enforcement and administrative authority for that statute and, as such, the Staff Commentary is routinely afforded considerable weight by the courts in interpreting the Act.[64]

The only court to address whether CSDs are tied to submitted applications reached the same conclusion reached by the FTC.  Daly v. Nw. Sav. Bank, 2013 WL 12291519 (W.D. Pa. Mar. 20, 2013).  In that case, Ms Daly visited a Nationwest Savings Bank branch and asked about her mortgage options.  Nationwest pulled her credit score and determined that she did not meet their basic criteria.  It did not provide her a CSD.  As here, Nationwest argued that no CSD was required because Daly never submitted an application.  Based on the broad language of 1681g(g), the court rejected that argument:

---

[63] Leonard v. Zwicker & Assocs., P.C., 713 F. App'x 879, 883 (11th Cir. 2017)(affording FTC staff interpretations of the FDCPA "considerable weight" as agency tasked with administrating the statute); Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1372 (11th Cir. 1998)("Although the FTC's construction of the FDCPA is not binding on the courts, because the FTC is entrusted with administering the FDCPA, its interpretation should be accorded considerable weight."); Hovater v. Equifax, Inc., 823 F.2d 413, 420 (11th Cir. 1987)(finding the FTC interpretation of the FCRA published in question and answer format "significant").

[64] Kidd v. Thomson Reuters Corp., 925 F.3d 99, 106 (2d Cir. 2019)(Giving the non-binding FTC guidance "persuasive deference" in interpreting the FCRA); Peterson v. Equifax Info. Servs. LLC, 2018 WL 7348859, slip op., p. 9 (N.D. Ga. Dec. 27, 2018)(same); Smith v. E-Backgroundchecks.com, Inc., 81 F. Supp. 3d 1342, 1363 (N.D. Ga. 2015)(finding FTC Staff Commentary to the FCRA instructive as the sole regulatory commentary on the relevant issue); Farmer v. Phillips Agency, Inc., 285 F.R.D. 688, 697, n. 12 (N.D. Ga. 2012)(finding FTC commentary to the FCRA instructive, noting that the 11th Circuit has given FTC staff commentary to the FDCPA considerable weight); Baynes v. ALLTEL Wireless of Ala., Inc., 322 F.Supp.2d 1307, 1314 (M.D.Ala.2004) (referring to FTC interpretations of FCRA provisions as instructive because the FTC "is the administrative agency charged with significant enforcement responsibilities under the FCRA.").

> Clearly, the use of the phrase "in connection with" expands the application of §
> 1681g(g)(1) beyond the consumer that submits a completed residential mortgage
> loan application secured by a particular property, and includes a pre-approval or
> prequalification application by a consumer making an inquiry for, or beginning the
> process to acquire, a residential mortgage. Northwest's construction makes the
> phrase "in connection with" superfluous. The plain language of § 1681g(g), in this
> instance, applies to Daly's prequalification request because it was made in
> connection with an application for a mortgage.

Id., slip op., p. 4.   The court also held that restricting the CSD requirement to submitted

applications thwarts, rather than furthers, the stated purpose of FCRA in supplying information to

consumers about the credit information used by potential creditors. Id., slip op., p. 5.

Congress knows how to tie a disclosure requirement to the submission of an application.

It did so in the adverse action notice requirement in Equal Credit Opportunity Act, 15 U.S.C. §§

1991-1691f ("ECOA").   The ECOA notice must be provided "to applicants" "after receipt of a

completed application for credit."  15 U.S.C. § 1691(d)(1).  This stands in stark contrast to the "in

connection with" and "initiated or sought by" language in Section 1681g(g).  These same terms

appear in the FCRA's definition of "adverse action," which includes any action made "***in

connection with*** an application that was made by, or a transaction that was ***initiated by***, any

consumer. . .."[65]  This language has been held to expand the FCRA adverse action requirement

beyond merely those transactions involving a submitted application.    Treadway v. Gateway

Chevrolet Oldsmobile Inc., 362 F.3d 971, 982 (7th Cir. 2004); Crane v. Am. Home Mortg., Corp.,

2004 WL 1529165. (E.D. Pa. July 7, 2004).  Because of the similarity in the language used in the

1681g(g) and FCRA's definition of "adverse action" cases addressing the later are instructive here.

Both Treadway and Crane compared FCRA's "application…initiated by" language to ECOA's

"complete application" and concluded that the FCRA requirement extends to "pre-qualification"

---

[65] 15 U.S.C. § 1681a(k)(1)(B)(iv)(I) (emphasis added).  The FCRA requires certain disclosures
when an "adverse action" is made based on credit information.  15 U.S.C. § 1681m(a).

decisions, regardless of whether a formal application is made; whereas ECOA "completed application" language limits the requirement to the submission of an application.  Treadway, 362 F.3d at 982; Crane, 2004 WL 1529165, slip op., p. 7.  Crane provides an in-depth analysis, noting that to deny notice to consumers whose credit information was used to disqualify them before the formal application stage would offend the underlying purposes of FCRA and FACTA.

> [T]he FCRA was enacted to protect consumers from the transmission of inaccurate information about them by requiring users of consumer credit information to alert consumers their credit history was used and by providing consumers with their credit information to determine its accuracy. *See* 15 U.S.C. § 1681m(a); *Razilov,* 242 F.Supp.2d at 989. **Given the statute's purpose, the Court finds it unlikely that Congress intended pre-qualification processes-through which a creditor obtains consumer credit reports and uses them to decide whether it should pursue a consumer's initial inquiry to the formal credit application stage-to fall outside the scope of the Act's protection.** Accordingly, the Court will apply the catch-all definition of adverse action to Crane's claim.

Crane, slip op., p. 7. (emphasis added).  The same observation applies here.  Given the goals of FCRA and FACTA to expand consumers' knowledge and rights with respect to the use of their credit information and the broad language specifically *not* tying the requirement to a submitted application, it makes no sense to deny CSDs to consumers whose score was used to determine eligibility prior to the submission of a completed application.  Congress clearly intended to provide consumers eliminated in the pre-application stage the same protections afforded those who submit completed applications.

There is no support for Quicken's position that 1681g(g) is only triggered by a completed application.  The only case cited by Quicken for this proposition is Bartlett v. Bank of Am., NA, 2014 WL 3773711, (D. Md. July 29, 2014).  That case addressed a request for a loan modification

and has nothing to do with whether the CSD requirement is limited to submitted applications.[66]

**D.**     **Plaintiff Was Owed a CSD Even Though She Did Not Initiate the Contact with Quicken**

Quicken makes a related argument that Plaintiff is not an "applicant" and not entitled to a CSD because she did not "seek" or "initiate" an application.  There are multiple problems with this argument, starting with the statute itself.  Section 1681g(g) contains no requirement that the consumer whose score is used (and is due a CSD) must be the same consumer initiating or seeking an application.   Rather, a CSD is required whenever "*a* consumer credit score" is used "in connection with an application initiated or sought by *a* consumer."   Congress could have substituted the second "a" with "the," thereby tying the CSD requirement to the same consumer initiating or seeking the application.  That Congress used "a" in both phrases expresses its intent to broaden the notice to any consumer whose score is used in connection with a mortgage loan, regardless of whether that consumer was the one initiating or seeking the application.

This is consistent with Congress' intent, through FACTA, not only to expand notice to consumers regarding the use of their credit information generally, but also to specifically address the growing problem of identity theft.[67] Congress' use of both "a"s in 1681g(g) extends notice to consumers whose credit information is accessed and used as a result of an application initiated by someone else. In the case of identity theft, that use would be without the consumer's permission or knowledge.  Quicken's interpretation would erase that benefit: A victim of the unauthorized use

---

[66] <u>Bartlett v. Bank of Am., NA</u>, 2014 WL 3773711, (D. Md. July 29, 2014)(request for a loan modification of "a pre-existing closed end loan is not an application for a loan covered by § 1681g(g).")

[67] FACTA added several provisions aimed specifically at identity theft, including consumers' right to place fraud alerts in their credit files (1681c-1(a)), to block information caused by identity theft or fraud (1681c-2(a)-(b)), and adding requirements aimed at notifying consumers of their rights when their credit is used without their knowledge (1681g(d)-(e)).

of his/her credit information would never receive a CSD because he/she did not initiate the application.  It makes no sense for a statute aimed at identity theft to produce that result.  Rather, by using both "a"s 1681g(g) provides notice to consumers whenever their scores are used, even without their knowledge, involvement or permission.

Aside the statute itself, Quicken's argument that Plaintiff was not due a CSD because she did not "seek" or "initiate" an application also clashes the actions it took at the time.  When it accessed and used Plaintiff's score, Quicken treated *both* Ajomales as potential joint borrowers "seeking" or "initiating" a mortgage loan.  It gathered information on them both through a form identifying them as joint applicants; it used that information to pull both credit reports and both sets of scores; and it evaluated both sets of scores for eligibility for a loan as equals.  No distinction was made between Mr. Ajomale as an "applicant" and Plaintiff as an unqualified non-applicant until *after* Quicken used their credit scores.  But 1681g(g) turns on "use" of a credit score; not any *post hoc* distinctions made after that use.  Because Quicken treated both Plaintiff and her husband as initiators and seekers of a mortgage application at the time is used their scores, they both fell within the protection of the statute and Quicken knew or should have known that Plaintiff was also entitled to a CSD.

Quicken's argument also conflicts with its stated purpose for pulling the credit scores in the first place.  Under the FCRA, credit scores can only be accessed for one of the listed permissible purposes.  The only purpose claimed by Quicken allows access by a user who "intends to use the information in connection with . . .the extension of credit to…*the* consumer."  15 U.S.C.  § 1681b(a)(3)(A)(emphasis added).[68]  As stated above, Quicken certified to Credco that it will obtain credit information solely "[i]n connection with a credit transaction **involving the consumer on**

---

[68] Exhibits 5 & 11.  See also Emerson Depo. (Ex. 2), pp. 128-31.

**whom the information is to be furnished and involving the extension of credit to. . .. the consumer**."[69] Quicken cannot have it both ways.  Having pulled Plaintiff's credit under the pretense of using that information "in connection" with a credit "transaction", Quicken cannot now pretend that its use of that information was not "connection with" a request for a mortgage loan. In other words, if Quicken had the permissible purpose to pull Plaintiff's score "in connection with" a request for a mortgage loan in the first place then, *a fortiori*, the use of that information falls squarely within 1681g(g) and she is entitled to a CSD.  Otherwise, the stated purpose for accessing her score was a sham.

Finally, Quicken's argument also conflicts with the sole reason its own witness gave for refusing to provide a CSD: She was not considered an applicant.  As stated above, the failure was solely the function of Quicken's policy that when a joint mortgage inquiry is submitted, only those potential borrowers qualified as "applicants" are entitled to a CSD.  It does not matter to Quicken which potential borrower "sought" or "initiated" the transaction.  Either way, the disqualified spouse would not receive a CSD because he or she would not be considered "applicant."[70]  In other words, had Plaintiff submitted the Lead Form for herself and her husband and taken the lead in communicating with Quicken (thereby removing any doubt that she was "initiating" or "seeking" an application), she still would not have received a CSD because she was not considered an "applicant."[71] Thus, the fact that Plaintiff was not the initiating spouse played no role in Quicken's failure to provide her a CSD.

---

[69] Exhibit 11. (emphasis added).

[70] Emerson Depo. (Ex. 2), pp. 165-68.

[71] Emerson Depo. (Ex. 2), pp. 72-74, 80, 138-139, 141-143 and 148-150.

**E.** <u>**Quicken Willfully Violated the FCRA**</u>

Section 1681n(a) allows recovery of actual, statutory and punitive damages against any person who willfully violates the FCRA.[72] The controlling standard for "willfulness" under FCRA was handed down by the Supreme Court in <u>Safeco Ins. Co. of Am. v. Burr</u>, 551 U.S. 47 (2007). Rejecting the notion that willfulness was confined to intentional conduct, <u>Safeco</u> instead adopted a reckless disregard standard.  <u>Id</u>, 551 U.S. at 69.  The standard is succinctly summarized as follows:

> To prove a willful violation, a consumer must prove that a consumer reporting agency either knowingly or recklessly violated the requirements of the Act. *Safeco*, 127 S.Ct. at 2208. To prove a reckless violation, a consumer must establish that the action of the agency 'is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.' *Id.* at 2215. An interpretation that favors the agency must be "objectively unreasonable" under either the text of the Act or "guidance from the courts of appeals or the Federal Trade Commission that might have warned [the agency] away from the view it took.' *Id.* at 2215, 2216

<u>Levine v. World Fin. Network Nat. Bank</u>, 554 F.3d 1314, 1318 (11th Cir. 2009).

A violation is reckless when a defendant's interpretation is inconsistent with the statutory language and/or guidance from the judiciary or the FTC that warned it of a risk of violating the statute.  <u>Syed v. M-I, LLC</u>, 853 F.3d 492, 504 (9th Cir.), <u>cert. denied,</u> 138 S. Ct. 447, 199 L. Ed. 2d 340 (2017)(where defendant's policy comports with no reasonable interpretation of the statute, the violation is willful even in the absence of regulatory guidance on the issue.); <u>Taylor v. Screen Reports, Inc.,</u> 294 F.R.D. 680 (M.D. Ga. 2013).  (Credit bureau's unreasonable interpretation of Section 1681g supported claim that it "knowingly" violated § 1681g); <u>Gillespie v. Equifax Info. Servs., LLC</u>, No. 05C138, 2008 WL 4316950, at *8 (N.D. Ill. Sept. 15, 2008) (Willfulness claim supported where credit bureau's interpretation of Section 1681g was contradicted by industrial and

---

[72]15 U.S.C. § 1681n(a)

regulatory guidance, including FTC Staff Opinions).  The Safeco holding is instructive here.

Although the Court found that Safeco violated the FCRA's adverse action requirement, it found

Safeco's violation not to be willful because the statute was "less than pellucid" and there was a

"dearth" of guidance from either the courts or the FTC which "might have warned it away from

the view it took."  551 U.S. at 70.

In contrast, there is abundant evidence here that Quicken knowingly and/or recklessly

violated 1681g(g).  To begin with, the controlling statute is clear.  "In connection with"

applications "initiated or sought by" cannot reasonably be interpreted as applying only to

submitted applications.  Daly v. Nw. Sav. Bank, 2013 WL 12291519, slip op. 7.  Finding

Northwest's policy of providing CSDs only to those who submitted applications to be a willful

violation of the FCRA, the Daly court noted the clarity of "in connection with," as well as the

FCRA's goal of expanding consumer access to their credit information.  Therefore, held the court,

"anytime Northwest acquired and used a consumer credit report in any type of credit transaction,

it should have been on notice that such use would trigger the protections of the FCRA."  Id.

Similarly, Quicken's failure to provide a CSD to Plaintiff was no mere oversight.  Nor was

it, as in Safeco, a close call made in the absence or regulatory or judicial guidance.  To the contrary,

there were warning signs screaming to Quicken that its "applicant only" policy violated the statute.

In addition to the plain text of 1681g(g), the FTC and the only court addressing the issue found

that text to clearly require a CSD when a score is used, without regard to whether the consumer

submitted an application.  Moreover, Quicken's Compliance Team recognized from the beginning

that the plain language of 1681g(g) required notice to anyone whose score was used, not just those

submitting applicants; and it acknowledged that its "applicants only" policy risked violating the

statute.[73]  At the same time, Quicken's chairman and majority shareholder proclaimed the CSD requirment "INSANE" and "MEANINGLESS."[74]  In the face of this attitude, and out of fear that sending CSDs to spouses (like Plaintiff) whose scores were used without their knowledge would increase calls by angry consumers, Quicken forged ahead.  Quicken made a calculated risk versus benefits decision.  It decided that the risks of violating the statute were outweighed by the benefits of avoiding increased calls from angry spouses.  And it never altered its policy, even in the face of warnings from industry, the FTC and the judiciary that the CSD requirement was triggered without the submission of an actual application.  At the same time, not a single authority (regulatory or judicial) emerged which supports Quicken's narrow reading of the statute.  This is more ample evidence upon which a jury could find that Quicken willfully violated the FCRA.

## F.    Actual Damages and The Section 1681o Claim

It is important to note at the outset that Quicken's argument regarding actual damages has no bearing on Plaintiff's willfulness claim.  Section 1681n allows recovery of actual *or* statutory damages for willful violations and proof of actual damages is not required for willfulness claims. 16 U.S.C. § 1681n; *see, e.g.*, Riley v. Equifax Credit Info. Servs., 194 F. Supp. 2d 1239, 1245 (S.D. Ala. 2002).  Proof of actual damages is required only with respect to Plaintiff's negligent claim.

Plaintiff's claim for negligent violation under Section 1681o is fully supported by the evidence.  As stated above, Quicken's failure to provide Plaintiff a CSD resulted from Quicken's "applicant only" policy which is contrary to the plain language of the statute, as well as the relevant

---

[73] Exhibit 8, p. 9.

[74] Id., p. 1 (all caps in original).

regulatory and judicial guidance.  This is ample evidence upon which a jury could find Quicken's actions unreasonable.

Also, Mrs. Ajomale testified at length as to her actual damages suffered as a result of Quicken's failure to provide the CSD.  She explained that the CSD form would have provided valuable information to her which she did not know at the time Quicken sent the CSD to Mr. Ajomale (the same day he first contacted Quicken).  In addition to the basic fact that her score was accessed and used by Quicken (which she did not know until weeks later when she pulled her credit report), the CSD would have informed her that she could have received a free credit report. Instead, she paid for credit report.[75]   Quicken's argument that this was not proximately related to the violation is without merit.  Had Quicken complied with the statute, she would have received the same disclosure sent to her husband, including the information about free credit report. Plaintiff testified that had she seen that disclosure she would have not incurred the costs of ordering a report.  She also described the stress and emotional strain created by not being included in or notified about the Quicken loan.[76]  "Actual damages" under the FCRA may include emotional or mental anguish.  *See, e.g.*, Riley, 194 F. Supp. 2d at 1244.[77]  This is ample evidence of actual damages.

## **CONCLUSION**

For all the reasons stated above, Quicken's Motion For Summary Judgment is due to be denied.

---

[75] Ajomale Depo. (Ex. 1), pp. 145-147

[76] Id., pp. 101-102, 145-147.

[77] Quicken does not challenge the adequacy of the evidence of mental anguish damages; it simply ignores the testimony altogether.  See Doc. 78, pp. 15-16.  Therefore, it has not carried its burden under Rule 56 regarding this point.

Respectfully submitted this the 28th day of August, 2019.

*/s/ Kenneth J. Riemer*
 KENNETH J. RIEMER (RIEMK8712)
Underwood & Riemer, P.C.
2153 Airport Boulevard
Mobile, Alabama 36606
Phone: 251.432.9212
Email: kriemer@alalaw.com
***One of the Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this foregoing pleading has been served upon the on all parties via this Court's CM/ECF electronic filing system on August 28, 2019.

*/s/ Kenneth J. Riemer*
 KENNETH J. RIEMER (RIEMK8712)